**SECOND DIVISION
BARNES, P. J.,
MILLER and RAY, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/**

**July 15, 2013**

# In the Court of Appeals of Georgia

A13A0634. PUGH v. THE STATE.

RAY, Judge.

Following a jury trial, Brandon Sanchez Pugh was convicted on three counts
of armed robbery (OCGA § 16-8-41) and two counts of a false statement to a law
enforcement officer (OCGA § 16-10-20). He appeals from the denial, in part, of his
motion for new trial, contending that he had ineffective assistance of counsel.[1] For
the following reasons, we affirm.

Viewed in the light most favorable to the verdict,[2] the evidence shows that
around 9:00 a.m. on August 18, 2008, Tracy Dukes, Betty Williams, and Areli Lynn

---

[1] In ruling on the defendant's motion for new trial, the trial court vacated the
convictions and sentences for the two counts of giving a false statement based on the
State's failure to establish venue for those charges.

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

Sanders were working as tellers at a Wachovia Bank branch when two African-American males wearing ski masks and gloves entered the bank, held them at gunpoint, and robbed them of approximately $18,000. The masked men took money from the tellers, which was placed into bags along with red dye packs. The men then took the bags and fled the bank.

Immediately before the robbery, a bank customer, Tom Thompson, was on his way into the bank to make a deposit when he noticed a white Cadillac Seville backed into a parking space with both the driver and passenger doors partially open. After completing his transaction at the bank, Thompson was walking back to his car when he saw two men wearing ski masks jump out of the Cadillac and run into the bank. Thompson immediately called 911 and provided the operator with the tag number of the vehicle. A few minutes later, Thompson saw the two men run out of the bank, get back into the Cadillac, and drive off.

As the perpetrators were driving off, another bank customer, Janet Hilgerson, had just pulled into the bank parking lot. A bystander yelled at Hilgerson, telling her that the bank had just been robbed and to "follow that car." Hilgerson turned her vehicle around and followed the white Cadillac Seville from the bank to a nearby Efficiency Lodge hotel. After the Cadillac turned into the Efficiency Lodge parking

lot, Hilgerson turned her vehicle around, went back to the bank, and provided the police officer who had responded to the scene with a partial tag number of the Cadillac and the vehicle's location.

The police went to the Efficiency Lodge and found the white Cadillac Seville parked behind the hotel. Investigators later found red dye stains inside the vehicle, as well as Pugh's checkbook.

After determining that the vehicle was registered to Pugh, investigators located Pugh later that day at Hartsfield Jackson International Airport, where he worked as a tug operator. Before speaking with Pugh, the investigators were informed that the Cadillac had been reported stolen. Pugh had gone to the East Point Police Department around 11:00 a.m. that day, approximately two hours after the armed robbery, and reported that his car had been stolen from a Texaco some 11 hours earlier, around 12:30 a.m.

The investigators interviewed Pugh at the Atlanta Police Department's office located within the airport. At the time of the interview, Pugh was accompanied by his supervisor and a Delta security officer. The investigators told Pugh why they wanted to speak with him and informed him that he was not under arrest. There is no evidence that Pugh was restrained in any way, or that he ever requested an attorney

3

to be present or asked to stop the interview. During the interview, Pugh stated that he was at home in bed at the time of the armed robbery and that he did not get out of bed until his parents came to get him to take him to the East Point Police Department to report that his car had been stolen.

One investigator testified that, before the interview, he thought that Pugh could have been a victim of car theft and that someone had used his car during the armed robbery, and that the investigator expected the interview to only last a few minutes. However, when questioned about the theft of his vehicle, Pugh gave inconsistent statements concerning the circumstances of the alleged theft, began showing signs of extreme nervousness, materially changed his account of what happened, and failed to give a logical reason or explanation as to why he did not immediately report the theft of his vehicle.

Pugh had a black book bag with him at the interview, which he admitted to having with him at the time of the theft. The investigators asked for and obtained Pugh's consent to examine its contents. The bag contained Pugh's vehicle registration and insurance cards (things that are typically kept in a vehicle), as well as gloves. The investigators also observed red stains on his left hand consistent with stains that would come from a red dye pack. Based on the foregoing, as well as the fact that

4

Pugh matched the physical description of one of the men involved in the armed robbery, Pugh was placed under arrest.

During the subsequent investigation, the police interviewed Pugh's neighbor, Ricky Smith, who stated that, at about 10:30 a.m. on the morning of the armed robbery, he observed Pugh being dropped off at his home by another man. Smith's statement, which he later confirmed through his testimony at trial, directly contradicted Pugh's account of his whereabouts on the morning of the armed robbery. The police executed a search warrant for Pugh's house and found a red stain in a bathroom trash can. The police were also able to determine that Pugh had a financial motive to commit the armed robbery, as Pugh was deeply in debt and had been sued in various lawsuits, and his wages were being garnished at the maximum rate.

Following a jury trial, Pugh was convicted on all charges for which he was indicted, but the trial court vacated his convictions for giving false statements to law enforcement. The remaining convictions for armed robbery are at issue on appeal.

1. Pugh contends that trial counsel rendered ineffective assistance by failing to impeach the testimony of Pugh's neighbor, Ricky Smith, with a prior inconsistent statement. We discern no error.

In considering the trial court's ruling on a claim of ineffective assistance of counsel, this Court accepts "the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Handley v. State*, 289 Ga. 786, 787 (2) (716 SE2d 176) (2011).

> The two-prong test for determining the validity of a claim of ineffective assistance of counsel provided in *Strickland v. Washington*, 466 U. S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), asks whether counsel's performance was deficient and, if so, whether this deficiency prejudiced the defense; that is, whether there is a reasonable probability that the outcome of the proceedings would have been different, but for counsel's deficiency.

(Punctuation and footnote omitted.) *Bruce v. State*, 252 Ga. App. 494, 498 (2) (555 SE2d 819) (2001).

At trial, Smith testified that he observed a man drop Pugh off at his home at about 10:30 a.m. on the morning of the armed robbery. This testimony was significant because Pugh had told the investigators that he had been at home in bed all morning and that he did not get up until 11:00 a.m. when his parents came to pick him up. On cross-examination, Pugh's trial counsel attempted to impeach Smith by presenting him with an "affidavit" that was not notarized which he had allegedly signed, in

6

which Smith denied seeing Pugh that morning and denied telling the police that he had seen him. Trial counsel asked Smith if he recalled meeting with an investigator for the defense, Sherry Embry, and being presented with the document. Smith testified that he had never met Embry, that he had never seen the document before, and that he did not sign it. Smith further testified that the portion of the document which stated that he had not seen Pugh that morning was not true. Embry was not called as a witness. When trial counsel moved to admit the document into evidence as a prior inconsistent statement, the trial court excluded the purported affidavit because Smith denied making it and because the document was not properly authenticated.

When Pugh's mother was later called as a witness for the defense, she testified that she went over to Smith's house and asked him if he saw Pugh get out of a car on the morning of the armed robbery. Pugh's mother further testified that, based on Smith's response, she (not Embry) presented him with the prepared affidavit and that Smith signed it in her presence. This was the same document that trial counsel had sought to admit into evidence earlier. When trial counsel moved again to admit the document into evidence, the jury was excused from the courtroom, and the trial court had a discussion with counsel. During this discussion, the trial court found that the

circumstances under which counsel was attempting to introduce the document were "extremely troubling and extremely irregular," and the court stated that it was "very disturbed" by trial counsel's explanation that he had misunderstood who had presented the document to Smith. The trial court lectured counsel about his lack of preparation for trial, given the fact that the inconsistent statement appeared to be a critical piece of information for the defense. Ultimately, the trial court excluded the statement from evidence, finding that Smith had not been given the opportunity to explain or deny the purported meeting with Pugh's mother, and that it would be unfair to the prosecution to allow the prior inconsistent statement to come in under these circumstances.

At the hearing on the motion for new trial, Smith admitted that Pugh's mother had presented him with the document and that he had signed it. But Smith further testified that the portion of the document which states that he had not seen Pugh that morning was untrue. Smith testified that he had seen Pugh, but clarified that he only saw him walking away from the man's car and that he did not actually see him get out of the vehicle. Thus, even had trial counsel been able to admit the statement into evidence, Smith's testimony concerning the statement would have still contradicted Pugh's alibi defense. At trial, Pugh, his mother, and his father each testified that they

had left together to go to the East Point Police Department before the time that Smith contends he saw Pugh walking away from the man's car.

Under these circumstances, we can not say that the exclusion of the inconsistent statement affected the outcome of the trial. See *Taylor v. State*, 282 Ga. 693, 696-697 (2) (c) (653 SE2d 477) (2007) (defendant could not show prejudice arising from failure to impeach witness with prior inconsistent statement, where there was no reasonable probability that the difference between witness's prior statement and her in-court testimony would have affected the result of the trial).

Furthermore, given the other evidence of Pugh's guilt, i.e. - the use of his car in the armed robbery, his delay in reporting the alleged theft of his vehicle, his inconsistent and conflicting accounts of the circumstances surrounding the alleged theft of his vehicle, the stains found on his hand and in his home which were consistent with the red dye packs from the bank robbery, his financial motive to commit armed robbery, and the fact that he matched the physical description of one of the perpetrators, Pugh cannot show a reasonable probability that the results of the trial would have been different had the statement been admitted. *Williams v. State*, 312 Ga. App. 693, 695-696 (3) (719 SE2d 501) (2011).

Therefore, Pugh has failed to establish that he suffered prejudice as the result of counsel's failure to impeach Smith with his prior inconsistent statement. "Failure to show prejudice from counsel's allegedly deficient performance is fatal to an ineffectiveness claim." (Citation omitted.) *Moore v. State*, 288 Ga. 187, 190 (2) (702 SE2d 176) (2010).

2. Pugh also contends that trial counsel rendered ineffective assistance by failing to file a motion to exclude the in-custody statements he made during his interview with investigators. Specifically, Pugh contends that suppression of his statements would have been warranted because he had not been advised of his *Miranda*[3] rights at the time of questioning, and that he had been questioned by the investigators for approximately two and a half hours in a coercive environment which would lead a reasonable person to conclude that he was not free to leave. We disagree.

When claiming ineffectiveness for failure to file a motion to suppress, an appellant must establish a strong showing that the damaging evidence would have been suppressed had the motion been filed. *Rivers v. State*, 283 Ga. 1, 5 (3) (b) (655 SE2d 594) (2008).

_____

[3] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

10

The issue of whether a person is in custody for *Miranda* purposes is a "mixed question of law and fact, and the trial court's determination will not be disturbed unless it is clearly erroneous." (Citation and punctuation omitted.) *DiMauro v. State*, 310 Ga. App. 526, 528 (1) (714 SE2d 105) (2011).

> A person is considered to be in custody and *Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary. Thus, the relative inquiry is how a reasonable person in [Pugh's] position would perceive his situation.

(Citations and punctuation omitted; emphasis supplied.) *State v. Folsom*, 285 Ga. 11, 12-13 (1) (673 SE2d 210) (2009). In other words, the proper inquiry focuses upon "the objective circumstances attending the particular interrogation at issue, and not upon the subjective views of either the person being interrogated or the interrogating officer." (Citation omitted.) *Crawford v. State*, 288 Ga. 425, 426 (2) (704 SE2d 772) (2011).

In this case, the investigators interviewed Pugh at the Atlanta Police Department's office located within the airport. At the time of the interview, Pugh was accompanied by his supervisor and another employee. Pugh was advised that he was

11

not under arrest. The officers were conducting a general investigation into the use of Pugh's vehicle in the armed robbery and the circumstances surrounding the theft of his vehicle. At the start of the interview, the investigators did not consider Pugh a suspect. Pugh was never told that he was not free to leave during the interview, nor was there evidence that Pugh was restrained in any way. Under the totality of the circumstances, we conclude that a reasonable person in Pugh's circumstances would not have concluded that he was in custody or otherwise deprived of his freedom. See *Mosely v. State*, 269 Ga. 17, 20 (3) (495 SE2d 9) (1998) (defendant was not entitled to be advised of *Miranda* rights where, at the time of questioning, officers were conducting a general investigation into a crime, defendant was not a suspect, and defendant was initially considered to be a victim). Furthermore, although the officers' suspicions as to Pugh's involvement in the armed robbery were aroused by Pugh's statements during the interview, the officers never communicated to Pugh that he was under arrest or that he was not free to leave.

We have previously held that "a custodial situation does not arise even if an officer believes he has probable cause to arrest a defendant, where the officer takes no overt step to communicate that belief." (Footnote omitted.) *Tobias v. State*, 319 Ga. App. 320, 324-325 (1) (735 SE2d 113) (2012). In *Tobias*, we found that a

12

defendant was not entitled to be advised of *Miranda* rights where she was not in custody at the time of questioning, even though the interrogating officer had determined that she would be arrested. Id. at 321-325 (1). Since Pugh was not in custody at the time he made the statements, he was not entitled to *Miranda* warnings.

It is well settled that the "[f]ailure to pursue a meritless motion cannot be evidence of ineffective assistance." (Citation omitted.) *Banks v. State*, 244 Ga. App. 191, 192 (1) (c) (535 SE2d 22) (2000). Accordingly, this enumeration of error is without merit.

*Judgment affirmed. Barnes, P. J., and Miller, J., concur.*